## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| SYSTEM DYNAMICS INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 23-431 |
| | ) | |
| THE UNITED STATES, | ) | Filed: September 21, 2023 |
| | ) | |
| Defendant, | ) | Re-issued: October 6, 2023[*] |
| | ) | |
| and | ) | |
| | ) | |
| STRATA-G SOLUTIONS, LLC, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## OPINION AND ORDER

Plaintiff, System Dynamics International, Inc. ("SDI"), filed this post-award bid protest challenging the United States Department of the Army's ("Army" or "Agency") decision to award an Indefinite Delivery Indefinite Quantity ("IDIQ") contract to Defendant-Intervenor, Strata-G Solutions, LLC ("Strata-G"), for Soldier Unmanned Aircraft Systems ("SUAS") design and engineering support. SDI alleges that the Agency (1) arbitrarily and irrationally evaluated technical proposals, (2) unreasonably evaluated professional compensation, (3) conducted a flawed cost realism analysis, and (4) made an arbitrary and capricious source selection decision. SDI requests the Court permanently enjoin performance of the contract award to Strata-G and

---

[*] The Court issued this opinion under seal on September 21, 2023, and directed the parties to file any proposed redactions by October 2, 2023. The opinion issued today incorporates the unopposed proposed redactions filed by SDI. Upon review, the Court finds that the material identified warrants protection from public disclosure, as provided in the applicable Protective Order (ECF No. 18). Redacted material is represented by bracketed ellipses "[. . .]."

require the Agency to perform a proper evaluation and issue a new award decision.

Before the Court are the parties' Cross-Motions for Judgment on the Administrative Record. For the reasons discussed below, the Court **GRANTS** SDI's Motion for Judgment and **DENIES** the Government's and Strata-G's Cross-Motions.

## I.  BACKGROUND

### A.    The Solicitation

This protest relates to a solicitation for SUAS design and development engineering support. Admin. R. 307–08, ECF No. 31 (hereinafter "AR").[1]  U.S. military forces and other government agencies employ SUAS in demanding mission profiles under diverse environmental conditions. AR 461.  The Army sought to hire a contractor to provide SUAS technical support services, including engineering, test, validation, verification, and maintenance sustainment related requirements.  AR 461.  The contract awardee would provide engineering services for Group I Unmanned Aircraft Systems consisting primarily of short-range reconnaissance, medium-range reconnaissance, and long-range reconnaissance aircrafts, as well as a handheld-ground control station.  AR 308.

On June 8, 2022, the Agency issued Request for Proposal No. W58RGZ-22-R-0073 ("RFP" or "Solicitation").  AR 307.  Per the Solicitation, the Agency intended to award on a competitive basis a Cost-Plus Fixed Fee IDIQ Small Business Set-aside contract.  AR 308.  The contract would have a one-year base period with four one-year options.  AR 308.  In conjunction with the contract award, the Agency also intended to award a task order to the IDIQ contract awardee.  AR 308.  As part of the task order, the awardee would provide engineering support with

---

[1] For ease of reference, citations to the Administrative Record refer to the bates-labeled page numbers rather than the ECF page numbers.

the design and development of a handheld-ground control station wireless interface.  AR 490.  The Agency would issue the contract and task order to the offeror whose proposal provided the "Best Value to the Government based on Source Selection Procedures."  AR 308; *see* AR 3062.  Section M of the Solicitation listed the "Evaluation Factors for Award."  AR 620.  The three evaluation factors in descending order of importance were Technical, Past Performance, and Cost/Price.  AR 620.  When combined, all non-Cost/Price factors were significantly more important than the Cost/Price factor.  AR 620; *see* AR 3258.

The three subfactors under the Technical factor, in descending order of importance, were Subfactor 1 - Technical Understanding, Subfactor 2 - Management of Resources, and Subfactor 3 - Initial Task Order.  AR 622; *see* AR 3259.  Under Subfactor 1, the Agency would evaluate offerors' plans to perform SUAS technical support services in accordance with the Performance Work Statement ("PWS").  AR 622–23.  Under Subfactor 3, the Agency would evaluate offerors' technical approach in meeting the program, contract, and management objectives as stated in the task order PWS.  AR 623.  And as relevant here, under Subfactor 2, the Agency would evaluate offerors' approach to recruiting, training, retaining, and replacing personnel with appropriate qualifications, experience, education, and skill levels in accordance with the PWS.  AR 623.  Specifically, the Agency would evaluate how each offeror's "proposed skill mix included in the technical volume corresponds to the skill mix in the Labor Category Mapping at RFP Section L Appendix A."  AR 623.  Appendix A listed 28 labor categories with "Minimum Education" and "Minimum Experience" for each category.  AR 550–54.  Offerors could "deviate from the Government provided labor mix (e.g., propose more or less hours for a certain labor category and/or propose other labor categories to perform the PWS)," but "[a]ny deviations [had to] be explained in the Basis for Estimate."  AR 596.  In response to a question about whether the Agency

would "allow experience in lieu of education," the Agency "recommend[ed] providing both education and experience to the extent possible[.]"  AR 662.

In evaluating the Technical factors, the Agency planned to assign adjectival ratings for combined technical/risk ratings:

| COMBINED TECHNICAL/RISK RATINGS | | |
|---|---|---|
| Color | Rating | Description |
| Blue | Outstanding | Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low. |
| Purple | Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate. |
| Green | Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| Yellow | Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| Red | Unacceptable | Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable. Proposal is unawardable. |

AR 627–28.  The consideration of risk in the combined technical/risk ratings would be based on risk ratings of Low Risk, Moderate Risk, High Risk, and Unacceptable Risk.  AR 628.

Under the Past Performance factor, the Agency would evaluate the likelihood of an offeror successfully performing the contract based on previous and current contracts of a similar nature and complexity.  AR 625.  The Agency required that offerors provide up to five submissions reflecting their recent and relevant performance.  AR 605.  The Agency would provide a Relevancy Rating and a Confidence Assessment for offerors' past performance.  AR 629.  The Relevancy Ratings were: Very Relevant, Relevant, Somewhat Relevant, and Not Relevant.  AR 629.  The Confidence Assessment Ratings were: Substantial Confidence, Satisfactory Confidence, Limited

4

Confidence, No Confidence, and Unknown Confidence (Neutral).  AR 629–30.

Under the Cost/Price factor, the Agency would evaluate proposals for compliance with submission requirements, balance, business systems, reasonableness, cost realism, and professional compensation in accordance with Federal Acquisition Regulation ("FAR") 52.222-46.  AR 625–26.  The Solicitation noted that Cost/Price would be considered reasonable if "in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business."  AR 625.  The Agency would perform a cost realism analysis to "determine whether specific estimated proposed cost elements are realistic for the work to be performed, reflect a clear understanding of contract requirements, and are consistent with the unique methods of performance described in the offeror's Technical proposal."  AR 626.  The Agency advised offerors to "clearly show justification for unique practices that significantly lower costs."  AR 626.  To determine the best estimate of cost that was most likely to result from an offeror's proposal, the Agency would calculate an evaluated cost by "adjusting each offeror's proposed cost to reflect any additions or reductions in cost elements to realistic levels based on the results of the cost realism analysis."  AR 626.  The Agency noted that if the evaluated cost was higher than the proposed cost, the evaluated cost would be used as the probable cost of performance as it related to the technical approach proposed by the offeror, and if the evaluated cost was lower than the proposed cost, the proposed cost would be used as the probable cost.  AR 626.  The probable cost would be utilized in the selection of the offeror that provided the best value to the Government.  AR 626.

Per the Solicitation, "[a] review of the compensation plan [would] be made in both the cost realism and the technical proposal evaluation."  AR 626.  Offerors would "submit a total compensation plan setting forth salaries and fringe benefits proposed for the professional

employees who will work under the contract."  AR 627.  The Agency would evaluate offerors'
proposals to ensure that the proposals reflect a sound management approach and understanding of
the contract requirements.  AR 627.  Supporting information included data such as recognized
national and regional compensation surveys and studies of professional, public, and private
organizations used in establishing the total compensation structure.  AR 627.  The Agency noted
that compensation levels "should reflect a clear understanding of work to be performed and should
indicate the capability of the proposed compensation structure to obtain and keep suitably qualified
personnel to meet mission objectives."  AR 627.  The Agency pointed out that "[f]ailure to comply
with these provisions may constitute sufficient cause to justify rejection of a proposal."  AR 627.

To conduct its evaluation, a team of Government employees would evaluate all proposals
in accordance with FAR 15.305 and Defense Federal Acquisition Regulation Supplement
("DFARS") 215.305.  AR 622.  The Source Selection Evaluation Board ("SSEB") included a
Technical Evaluation Team ("TET") and Past Performance Team that would evaluate the non-
Cost/Price factors and assign adjectival ratings as defined by the Solicitation.  AR 622; *see* AR
723.  The Cost/Price Evaluation Team ("CPET") would evaluate offerors' proposals for the
Cost/Price factor.  AR 3047.  An adjectival rating would not be assigned to the Cost/Price factor.
AR 622.  To be eligible for an award, offerors had to receive an evaluation rating of "Acceptable"
or higher under the Technical factor and a rating of at least "Relevant" and "Satisfactory
Confidence," or "Unknown Confidence," under the Past Performance factor.  AR 620.  An
evaluation of "Limited Confidence" or "No Confidence" in the Past Performance factor would
render the entire proposal "Unacceptable."  AR 620–21.  Additionally, offerors' cost/price had to
be found complete, fair, reasonable, balanced, and realistic.  AR 621.  Per the Solicitation, the
Agency reserved the right to make the award based upon the Cost/Price factor if the Technical and

Past Performance evaluation results were substantially the same.  AR 625.

The Solicitation set forth the following definitions related to the adjectival ratings:

- *Deficiency*. A material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level. See FAR 15.001. Examples of deficiencies include a statement by the offeror that it cannot or will not meet a requirement, an approach that clearly does not meet a requirement, or omission of data required to assess compliance with the requirement.
- *Strength*. An aspect of an offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance.
- *Significant Strength*. An aspect of an offeror's proposal that has appreciable merit or appreciably exceeds specified performance or capability requirements in a way that will be appreciably advantageous to the Government during contract performance.
- *Uncertainty*. Any aspect of a non-cost/price factor proposal for which the intent of the offer is unclear (e.g., more than one way to interpret the offer or inconsistencies in the proposal indicating that there may have been an error, omission, or mistake).
- *Weakness*. A flaw or omission in the proposal that increases the risk of unsuccessful contract performance. See FAR 15.001.
- *Significant Weakness*. A flaw that appreciably increases the risk of unsuccessful contract performance. See FAR 15.001.

AR 630.

**B.**    **The Evaluation and Award**

On June 28, 2022, the Agency received proposals from four offerors: Strata-G, SDI, [. . .], and [. . .].  AR 3078; *see* AR 755, 925, 1409, 1800.  In the Source Selection Decision Document ("SSDD") dated February 27, 2023, the Source Selection Authority ("SSA") provided a summary of the results of the Agency's evaluation.  AR 3257–58.  The offerors received the following ratings:

| | Offeror | | | |
|---|---|---|---|---|
| **Factor** | **[. . .]** | **System Dynamics International, Inc. (SDI)** | **Strata-G Solutions, LLC (Strata-G)** | **[. . .]** |

| 1 - Technical Overall | Unacceptable | Good | Good | Unacceptable |
|---|---|---|---|---|
| Subfactor 1 | Unacceptable | Good | Good | Unacceptable |
| Subfactor 2 | Good | Good | Good | Good |
| Subfactor 3 | Acceptable | Acceptable | Good | Unacceptable |
| 2 - Past Performance Relevancy and Confidence | Relevant/ Satisfactory Confidence | Very Relevant/ Substantial Confidence | Relevant/ Satisfactory Confidence | Somewhat Relevant/Limited Confidence |
| 3 - Cost/ Price | $[. . .] | $[. . .] | $71,770,380 | $[. . .] |

AR 3265.  Per the Solicitation, [. . .] and [. . .] were excluded from receiving the award because they received an Unacceptable rating for the Technical factor.  AR 3274.

The evaluation team provided the following ratings for SDI and Strata-G under the Technical factor:

| Technical Subfactor | SDI | Strata-G |
|---|---|---|
| Overall | Significant Strengths: 1<br>Strengths: 28<br>Significant Weaknesses: 1<br>Weaknesses: 14<br>Uncertainties: 5<br>Deficiencies: 0 | Significant Strengths: 3<br>Strengths: 25<br>Significant Weaknesses: 1<br>Weaknesses: 14<br>Uncertainties: 4<br>Deficiencies: 0 |
| Subfactor 1 | Significant Strengths: 1<br>Strengths: 20<br>Significant Weaknesses: 1<br>Weaknesses: 13<br>Uncertainties: 5<br>Deficiencies: 0 | Significant Strengths: 1<br>Strengths: 17<br>Significant Weaknesses: 0<br>Weaknesses: 14<br>Uncertainties: 2<br>Deficiencies: 0 |
| Subfactor 2 | Significant Strengths: 0<br>Strengths: 6<br>Significant Weaknesses: 0<br>Weaknesses: 0<br>Uncertainties: 0<br>Deficiencies: 0 | Significant Strengths: 1<br>Strengths: 5<br>Significant Weaknesses: 1<br>Weaknesses: 0<br>Uncertainties: 2<br>Deficiencies: 0 |
| Subfactor 3 | Significant Strengths: 0<br>Strengths: 2<br>Significant Weaknesses: 0<br>Weaknesses: 1<br>Uncertainties: 0 | Significant Strengths: 1<br>Strengths: 3<br>Significant Weaknesses: 0<br>Weaknesses: 0<br>Uncertainties: 0 |

| | Deficiencies: 0 | Deficiencies: 0 |
|---|---|---|

AR 2565, 2573, 2575, 2576 (SDI); AR 2681, 2691, 2694, 2696 (Strata-G). The SSA noted that Strata-G received a single Significant Weakness under Technical Subfactor 2 with respect to 34 issues that were not sufficiently addressed in its Skill Mapping spreadsheet. AR 3288. SDI, on the other hand, received a single Significant Weakness for not fully addressing the PWS 3.12.8 Hazardous Material Management Plan requirements under Subfactor 1. AR 3288.

Under the Cost/Price factor, the CPET compared all the price proposals to each other and to the Independent Government Estimate ("IGE") to evaluate reasonableness. AR 3052–53. Strata-G's price proposal was the lowest among all four offerors and 22.3 percent below the IGE. AR 3052–53. SDI's price proposal was the second highest among the four offerors and [. . .] percent below the IGE. AR 3052–53. To evaluate cost realism, the TET performed a technical evaluation of offerors' Cost/Price proposals, assessing labor hours, labor skill mixes, types and quantities of material, travel, and other direct costs, and provided the evaluation results to the CPET. AR 3053–54. The CPET compared the proposed labor rates to the rates maintained by the United States Bureau of Labor Statistics ("BLS") for Huntsville/Madison County, Alabama. AR 3054. The CPET found proposed labor rates that fell within the 10th to 90th percentiles of the BLS rates to be realistic and adjusted any proposed rates that fell outside of those percentiles. AR 3054. That is, the Agency adjusted any proposed labor rates that fell below the 10th percentile up to the 10th percentile and adjusted any proposed labor rates that were above the 90th percentile down to the 90th percentile. AR 3054. SDI's evaluated cost was $[. . .] lower than its proposed costs, and Strata-G's evaluated cost was $5,478,682 lower than its proposed costs. AR 3056–57. Since there is no incumbent for the contract, the CPET evaluated professional compensation by verifying that the total compensation shown in each offeror's total compensation plan matched the

labor rates in its proposed price.  AR 3059.  It concluded that all four offerors' proposed

compensation plans were in accordance with FAR 52.222-46.  AR 3059.  In sum, the Agency

found that all four offerors proposed reasonable, realistic, and balanced prices.  AR 3080, 3286.

The SSA performed a best value determination based upon the findings of the SSEB.  AR

3286.  In the trade-off discussion section of the SSDD, the SSA noted that although Strata-G and

SDI each had a Significant Weakness in one of the technical subfactors, Strata-G's weakness was

in Subfactor 2 whereas SDI's was in Subfactor 1 which, as ranked by the Solicitation, was

significantly more important than Subfactor 2.  AR 3288.  The SSA found that Strata-G "provides

the best overall value to the Government at a fair and reasonable price."  AR 3287.  Accordingly,

on February 28, 2023, the Agency awarded the contract and task order to Strata-G.  AR 3290.  On

March 6, 2023, the Agency notified [. . .], SDI, and [. . .] that they were not selected for the award.

AR 3344–52.

### C.    Procedural Background

#### 1.    The Initial Protest and Agency Voluntary Remand

On March 28, 2023, SDI filed its four-count Complaint in this Court protesting the

Agency's evaluation and award decision.  *See* Pl.'s Compl., ECF No. 1.  In its Complaint, SDI

alleged that: (1) Strata-G has a contract that gives it unequal access to information, and its duties

under the awarded contract give it an impaired objectivity organizational conflict of interest

("OCI"); (2) the Agency's evaluation of proposals under the Technical factor was arbitrary and

irrational; (3) the Agency arbitrarily and irrationally deemed Strata-G's low price and its

professional compensation plan realistic; and (4) the Agency's best value decision was arbitrary

and irrational.  *Id.* at 17–27. (Counts I–IV).  On May 5, 2023, SDI filed its First Amended

Complaint and Motion for Judgment on the Administrative Record.  *See* Pl.'s First Am. Compl.,

ECF No. 34; Pl.'s Mot. for J. on the Admin. R., ECF No. 35.  In its First Amended Complaint, SDI withdrew the OCI claim and alleged that: (1) the Agency's professional compensation plan analysis was irrational, arbitrary, and capricious; (2) the Agency's cost realism analysis arbitrarily employed a mechanical formula for determining realism and ignored Strata-G's use of outdated inputs to rationalize its extremely low rates; (3) the Agency's Technical factor evaluation was arbitrary and irrational; and (4) the SSDD was arbitrary and capricious.  ECF No. 34 at 16–39 (Counts I–IV).

On May 16, 2023, the Government moved for a voluntary remand to allow the Agency to reconsider certain cost/price aspects of its evaluation underlying the award decision.  Def.'s Mot. for Voluntary Remand at 1, ECF No. 36.  In support of its request, the Government noted that the record contained an "inconsistency that require[d] clarification and/or further explanation."  *Id.* at 2.  The Government also stated that the Agency expected to reconsider its cost realism analysis as it related to Strata-G's proposed compensation for professional employees.  *Id.*  On May 18, 2023, the Court granted the Government's motion.  *See* ECF No. 38.  On June 18, 2023, the Agency filed a status report with the remand results and filed an updated SSDD, SSEB report, Cost/Price summary report, offerors' individual Cost/Price reports, and labor rates comparison for SDI and Strata-G.[2]  *See* Status Report as to Results of Voluntary Remand, ECF No. 40; Suppl. to Admin. R., ECF No. 41.  In its supplement, the Agency included a professional compensation analysis for Strata-G, ECF No. 41-5 at 16–23, an updated SSEB report stating that Strata-G's cost/price was reasonable, ECF No. 41-1 at 115 (Evaluation Summary), Technical Assessment pages for each offeror, ECF No. 41 at 31–33, and more explanation of Strata-G's Significant Weakness, *id.* at 15–

---

[2] At oral argument, the parties moved to complete the Administrative Record by adding the materials at ECF No. 41.  Oral Arg. Tr. at 5:17–6:17, 119:20–120:11, ECF No. 55.  The Court grants the motion.

16.   In its post-remand status report, the Government noted that the Agency "reconsidered its cost/price and cost realism analysis, and considered other administrative actions consistent with those considerations."   ECF No. 40 at 1.   The Agency concluded that Strata-G remained the "proper awardee of the disputed contract."   *Id.*

    2.    The Present Protest

On July 11, 2023, SDI filed its Second Amended Complaint.   *See* Pl.'s Second Am. Compl., ECF No. 46.   The four-count Second Amended Complaint alleges, like the First Amended Complaint, that the Agency: (1) arbitrarily and irrationally evaluated technical proposals, (2) unreasonably evaluated professional compensation, (3) conducted a flawed cost realism analysis, and (4) made an arbitrary and capricious source selection decision.   *Id.* at 16–39 (Counts I–IV). SDI filed a new motion for judgment that same day elaborating its arguments under each count. Pl.'s Restated Mot. for J. on the Admin. R., ECF No. 47.   SDI requests the Court declare that the Agency's evaluation of proposals and source selection decision was irrational, arbitrary, capricious, an abuse of discretion, and contrary to law.   *Id.* at 42.   It further requests that the Court permanently enjoin the performance of the contract awarded to Strata-G and require the Agency to perform a proper evaluation to make a reasonable award decision.   *Id.*

On July 28, 2023, the Government and Strata-G filed Cross-Motions for Judgment on the Administrative Record.   *See* Def.'s Cross-Mot. for J. on Admin. R., ECF No. 50; Def.-Intervenor's Cross-Mot. for J. on Admin. R., ECF No. 49.   The Government and Strata-G argue that the Agency conducted a reasonable technical evaluation, the Agency reasonably evaluated Strata-G's professional compensation plan, the Agency conducted a reasonable cost realism analysis, and the SSA rationally analyzed the proposals to make a best value determination.   *See* ECF No. 50 at 18–38; ECF No. 49 at 5–6.   The Government and Strata-G further argue that SDI is not entitled to

permanent injunctive relief.  *See* ECF No. 50 at 38–43; ECF No. 49 at 44–45.  The motions are

now fully briefed.  *See* Pl.'s Reply, ECF No. 51; Def.'s Reply, ECF No. 53; Def.-Intervenor's

Reply, ECF No. 52.  The Court held oral argument on August 18, 2023.

## II.  LEGAL STANDARDS

### A.    Motions for Judgment on the Administrative Record

RCFC 52.1(c) governs motions for judgment on the administrative record.  Such motions

are "properly understood as . . . an expedited trial on the record."  *Bannum, Inc. v. United States*,

404 F.3d 1346, 1356 (Fed. Cir. 2005).  In contrast to the standard for summary judgment, "the

standard for judgment on the administrative record is narrower" and involves determining, "given

all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the

burden of proof to show that the [challenged action or] decision was not in accordance with the

law."  *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357).

Therefore, a genuine issue of disputed fact does not prevent the Court from granting a motion for

judgment on the administrative record.  *See Bannum*, 404 F.3d at 1357.

### B.    Bid Protest Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996,

provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an

interested party objecting to . . . the award of a contract or any alleged violation of statute or

regulation in connection with a procurement . . . ."  28 U.S.C. § 1491(b)(1).  In such actions, the

Court "review[s] the agency's decision pursuant to the standards set forth in section 706" of the

Administrative Procedure Act.  28 U.S.C. § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United*

*States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Accordingly, the Court examines whether an

agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law."  5 U.S.C. § 706(2)(A); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001).  Under such review, an "award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332.  To prevail in a bid protest, "a protestor must show a significant, prejudicial error in the procurement process." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).  A protestor establishes prejudice by showing "that there was a substantial chance it would have received the contract award but for that error." *Alfa Laval*, 175 F.3d at 1367 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).

In reviewing an agency's procurement decisions, the Court does not substitute its judgment for that of the agency. *See Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 231 (1997); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997); *see also M.W. Kellogg Co. v. United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations").  The disappointed bidder "bears a heavy burden," and the contracting officer is "entitled to exercise discretion upon a broad range of issues . . . ." *Impresa*, 238 F.3d at 1332–33 (citations and quotes omitted).  This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities." *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988); *see Campbell v. United States*, 2 Cl. Ct. 247, 249 (1983).  A procurement decision is rational if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1333.  "[T]hat explanation need not be extensive." *Bannum,*

14

*Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009) (citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).

### III.  DISCUSSION

Although the parties' motions raise several issues, this case can be resolved on a narrower ground.  Specifically, the Court finds that SDI is entitled to judgment on the administrative record because the Agency should have assigned a Deficiency to Strata-G for Technical Subfactor 2.  Per the RFP, receiving even one Deficiency results in an Unacceptable rating such that the proposal is not awardable.  Had the Agency properly found Strata-G ineligible, SDI would have been the only acceptable proposal remaining in response to the RFP.  Therefore, the Agency's error prejudiced SDI, and SDI is entitled to injunctive relief.[3]

**A.**     **The Agency Acted Arbitrarily and Capriciously in Awarding the Contract to Strata-G Because Strata-G Should Have Received an Unacceptable Rating.**

SDI argues that the Agency made findings with respect to Strata-G's Technical Subfactor 2 proposal that met the definition of a Deficiency, yet the Agency irrationally assigned a Significant Weakness instead.  ECF No. 47 at 19–20.  According to SDI, had the Agency evaluated Strata-G in accordance with the RFP it should have received an Unacceptable Technical factor rating.  *Id.* at 21.  SDI argues that the Agency's error prejudiced SDI.  The Court agrees.

1.     Strata-G Should Have Received a Deficiency Under Technical Subfactor 2.

Strata-G received a Significant Weakness under Subfactor 2 because its "Skill Mapping was found to be an insufficient match to the Government's Educational Degree requirement."  AR 3160; *see* AR 3271.  SDI argues that Strata-G should have received a Deficiency instead of a Significant Weakness because the Agency found Strata-G failed to meet the educational degree

_____

[3] Because of this finding, the Court need not address the remaining arguments regarding other Technical factor evaluation issues, professional compensation, and cost realism.

requirements provided in the Solicitation and failed to provide enough information for the Agency to properly evaluate Strata-G's proposed personnel. ECF No. 47 at 22–25. Specifically, SDI contends that Strata-G's proposal made changes to the Minimum Education provided for numerous labor categories. *Id.* at 22. Using the Program Manager III labor category as an example, SDI notes that Strata-G proposed an individual with a "Bachelor degree from an accredited university" instead of a "Bachelor of Science [degree] from an accredited university," as required by the Solicitation, and that Strata-G alternatively proposed to substitute experience or an Associate degree and experience for a Bachelor degree. *Id.* at 22, 25. SDI argues that the Agency's evaluation was arbitrary and irrational because even though the Agency found that 22 of Strata-G's proposed personnel were not qualified, the Agency gave Strata-G only a Significant Weakness. *Id.* at 23. It further claims that the Agency's explanation on remand for assigning such rating— that Strata-G simply failed to specify the type of degree, rather than failed to meet a requirement— is unreasonable because Strata-G did propose specific degrees for some labor categories where it intended to fill the position with an individual holding that specific degree. *Id.* at 24.

The Government and Strata-G argue that the Agency rationally assessed each offeror's proposed personnel under the terms of the Solicitation. ECF No. 50 at 20; ECF No. 49 at 19. According to the Government, Strata-G received a Significant Strength under Subfactor 2 because it proposed personnel with higher levels of experience than the Minimum Experience stated in the Government's labor matrix. ECF No. 50 at 20. Pointing to the Program Manager III example, the Government emphasizes that Strata-G proposed an individual with a Bachelor degree and 15 years of related experience to fulfill the Agency's requirement of a Bachelor of Science or Engineering degree and 10 years of experience. *Id.* at 20–21. While the Government acknowledges that the Agency found Strata-G's Skill Mapping spreadsheet contained numerous labor categories where

the minimum education requirement was not sufficiently addressed, it argues that this flaw is not a Deficiency under the Solicitation because the evaluation team determined that it "increase[d] the risk of unsuccessful contract performance," but not to an unacceptable level. *Id.* at 22. Determining whether the flaw was a Significant Weakness or Deficiency, and whether it was outweighed by Significant Strengths, was within the Agency's discretion, the Government contends; SDI's arguments are mere disagreements with the Agency's ratings. *Id.* at 23. For its part, Strata-G argues that if the Agency had intended to impose the educational degrees as a mandatory minimum requirement, it would have done so clearly and unequivocally. ECF No. 49 at 28.

To resolve the dispute, the Court must first look to the language of the Solicitation itself. The Court finds that the Agency should have assigned a Deficiency to Strata-G under Subfactor 2 because it found that Strata-G failed to meet the Solicitation's educational degree requirements. The Solicitation, under Section L Subfactor 2, stated:

> The Offeror shall describe their proposed approach for this contract to recruiting/obtaining, training, retaining, and replacing *personnel of appropriate qualifications, experience, education, and skill levels to satisfy the requirements and objectives set forth in the PWS.* Any proposed skill mix included in the technical volume *shall match* the skill mix included in the Labor Category Mapping at RFP Section L Appendix A.

AR 603 (emphasis added). Section M of the Solicitation under Subfactor 2 further stated:

> The Government will evaluate how the offeror's proposed approach for this contract to recruiting/obtaining, training, retaining, and replacing *personnel of appropriate qualifications, experience, education, and skill levels satisfies the requirements and objectives set forth in the PWS . . . .* The Government will evaluate *how the offeror's proposed skill mix* included in the technical volume *corresponds to the skill mix included in the Labor Category Mapping at RFP Section L Appendix A.*

AR 623 (emphasis added). The Labor Category Mapping in Appendix A listed "Minimum Education" and "Minimum Experience" for each of the 28 labor categories. Of the 26 categories

listing a college degree for "Minimum Education," the mapping specified either a "Bachelor of Engineering," "Bachelor of Science or Engineering," or "Bachelor of Arts or Science or Engineering" degree from an accredited university.  AR 550–53.  The amount of "Minimum Experience" for each category ranged from zero to 10 years of relevant or related experience.  AR 550–54.

For 22 of the 28 labor categories, Strata-G's proposal failed to match the minimum education stated in the Solicitation because Strata-G either did not propose the type of degree expressly provided for by the Agency and/or proposed to substitute work experience or an Associate degree plus work experience for the type of degree specified.  *See* AR 3013–23; *see also* AR 3160, 3271.  Specifically, Strata-G proposed personnel with a "Bachelor degree from an accredited university," where the Solicitation required either a "Bachelor of Engineering," "Bachelor of Science or Engineering," or "Bachelor of Arts or Science or Engineering," and it alternatively proposed personnel who had no degree and "6 years of work experience or [an] Associates degree and 4 years work experience" as a substitute for all labor categories specifying a type of Bachelor degree.  AR 1739–42.  All in all, the Agency identified 34 issues involving minimum education that Strata-G did not sufficiently address.  *See, e.g.*, AR 3160, 3271.

Beginning with the TET's individual and consensus reviews, the evaluators found that Strata-G deviated from the minimum education requirement and, as a result, the Agency was not assured that Strata-G's proposed personnel had the correct educational qualifications.  AR 2257 (concluding that Strata-G's Skill Mapping spreadsheet "did not fully meet Government requirements"), 2282 (finding the Skill Mapping spreadsheet "to be an insufficient match to the Government Educational Degree requirement due to not properly proposing employees with correct educational degrees"), 2693 (same).  The TET made more pointed findings in a worksheet

it completed to support the CPET's Cost/Price evaluation.  Specifically, for 22 labor categories the TET answered "No" to the question whether Strata-G "proposed qualified personnel for accomplishing the PWS requirements (Yes or No)."  AR 3013; *see* AR 3013–21.  The TET explained its rationale, stating Strata-G failed to propose the specific Bachelor degree specified in the Solicitation and/or was "proposing that substitutes [for] an appropriate degree is acceptable vers[u]s the Government's requirement."  AR 3013; *see* AR 3013–21.  In so doing, the TET acknowledged that Strata-G did not propose qualified personnel required by both Sections L and M of the Solicitation.

The SSEB report adopted the TET's findings, explicitly observing that Strata-G's "proposing a Bachelor degree versus the Government's specific call out for Bachelor of Science and/or Bachelor of Engineering" (11 instances), as well as proposing a substitute for a Bachelor degree (23 instances), "[did] not match the Government[']s  requirement of having personnel with the proper accredited degree for each person."  AR 3160.  The SSDD likewise noted the "34 issues," finding (just as the SSEB did) that the deviations in Strata-G's Skill Mapping spreadsheet "prevent[ed] the Government from evaluating the personnel capabilities being proposed and [] show[ed] a lack of understanding by the Offeror to explain Skill Mapping differences."  AR 3271; *see* AR 3160.  At each level, the Agency assigned a Weakness or Significant Weakness based on these deviations from the minimum education requirement.  AR 2257, 2282, 2693, 3160, 3271.

What the Agency described as a Significant Weakness, however, meets the definition of a Deficiency.  According to the Solicitation's definitions, a Deficiency is:

> *A material failure of a proposal to meet a Government requirement* or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level. See FAR 15.001. Examples of deficiencies include a statement by the offeror that it cannot or will not meet a requirement, *an approach that clearly does not meet a requirement, or omission of data required to assess compliance with the requirement.*

19

AR 630 (emphases added).  Both the TET's and SSEB's evaluations acknowledged that Strata-G's proposal failed to meet the Government's educational degree requirement.  AR 2693–94, 3160.  As a result, the TET found that over 70 percent of Strata-G's proposed personnel were not qualified to accomplish the PWS requirements and in each instance recommended Strata-G "[h]ire[] [an] appropriately degree[d] individual" for the position.  AR 3013; *see* AR 3013–21.  The SSEB and SSA further concluded that the insufficient match to the Government's educational degree requirement "prevent[ed] the Government from evaluating the personnel capabilities being proposed."  AR 3160; *see* AR 3271.  According to the plain language of the Solicitation, those findings qualify as a Deficiency under Technical Subfactor 2.  AR 630.

The Government's and Strata-G's contrary arguments are unavailing.  The Government points to the updated SSEB report and updated SSDD created during remand, in which the Agency explained that Strata-G's Significant Weakness "was in not specifying the type of the degrees (e.g., Bachelor of Science versus a Bachelor of Engineering degree)" and that Strata-G "did not fail to meet multiple Government requirements."  ECF No. 41 at 15–16; *see* ECF No. 41-1 at 102.  The first rationale is belied by the Administrative Record.  *See Golden IT v. United States*, 165 Fed. Cl. 676, 688 (2023) ("The Court will not accept a finding that is 'in tension with, if not contradicted by, various aspects of [the] record.'" (quoting *Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 35 (2010), *aff'd*, 649 F.3d 1320 (Fed. Cir. 2011))).  Strata-G did specify the types of Bachelor degree for the personnel it proposed for 13 of 28 labor categories, yet it intentionally and broadly listed only "Bachelor degree" for 13 other categories.  *Compare* AR 3013 (Program Manager III; "Bachelor degree"), *with* AR 3016 (Design Engineer III; "Bachelor of Engineering"), 3021 (Cybersecurity Engineer II; "Bachelor of Science or Engineering"), 3022 (Safety Engineer I; "Bachelor of Arts or Science or Engineering").  The only reasonable way to construe the distinction

is to conclude that when Strata-G listed "Bachelor degree" it was proposing an individual with *any type* of Bachelor degree.  The record tends to indicate that the Agency understood that distinction.  *See* AR 3013 (faulting Strata-G for failing to propose a Bachelor of Science or Engineering candidate), 3160 (concluding Strata-G had not properly proposed personnel "with the correct educational degrees").  If it were truly ambiguous what type of degree Strata-G intended to specify (*e.g.*, Science versus Engineering), then one would expect the Agency to have assigned an Uncertainty and to have engaged with Strata-G on the issue during discussions.  AR 630 (defining Uncertainty as "[a]ny aspect of a non-cost/price factor proposal for which the intent of the offer[or] is unclear").  And notably, Strata-G does not support the Government's ambiguity argument.  *See* ECF No. 49 at 25 (acknowledging that "Strata-G's labor mix deviated from the appendix in minimum educational degree requirements").

The second rationale is vague and conclusory, at best, or imposes a heightened standard for a Deficiency, at worst.  Assuming the updated SSEB report and updated SSDD purport to find that the mismatch between Strata-G's Skill Mapping spreadsheet and the "Minimum Education" stated in the Solicitation was not a material failure to meet a Government requirement (although it does not clearly state as much), they provide no rationale for why that is so.  *See Impresa*, 238 F.3d at 1333.  In the very paragraph that the SSEB updated with this cursory explanation, it twice referred to the educational degrees specified for each labor category as the Government's "requirement."  ECF No. 41-1 at 102.  Reference to Minimum Education as a requirement is also replete throughout the record and the Government's motion.  *See, e.g.*, AR 2257 ("Education requirements"), 2693 ("the Government's Educational Degree requirement"), 3013 (instructing the TET to compare offerors' labor skill mix with "the contract's minimum contract requirements for each labor category"); ECF No. 50 at 21 ("minimum education requirement").  If the post-

remand SSEB report and SSDD purport to emphasize that Strata-G did not fail to meet *multiple* Government requirements (as opposed to any, or an overall, Government requirement), they misapply the definition of Deficiency, which instructs the Agency to assign such rating where a proposal materially fails to meet "a Government requirement" (singular). AR 630. In short, the record on remand does nothing to save the Agency's evaluation of Strata-G's Skill Mapping spreadsheet.

Equally unavailing is Strata-G's argument that the educational degrees were not a mandatory minimum requirement—*i.e.*, a pass/fail or go/no go requirement—of the Solicitation. ECF No. 49 at 26–27. SDI does not argue that they were.[4] ECF No. 51 at 11. But according to the Agency's evaluation team, minimum educational degrees were "a Government requirement." AR 630; *see, e.g.*, AR 3160. That the Solicitation allowed for some deviation from the provided labor mix and that the Agency's response to Questions and Answers did not affirmatively preclude offerors from proposing experience in lieu of education is largely immaterial in the face of such finding. ECF No. 49 at 27; *see* AR 596 (providing that "[o]fferors may deviate from the Government provided labor mix (e.g., propose more or less hours for a certain labor category and/or propose other labor categories to perform the PWS)"), 662 (responding that the Agency "recommends providing both education and experience to the extent possible"). Indeed, it is curious that Strata-G attempts to support its arguments with these record citations, where (a) it did not follow the Agency's recommendation to provide both the minimum education and experience for proposed personnel, and (b) the Agency faulted Strata-G for "show[ing] a lack of understanding . . . to explain Skill Mapping differences." AR 3160.

---

[4] Nor does SDI contend that omission of information from a proposal was a per se Deficiency. *See* ECF No. 50 at 27.

The Government further maintains that the SSEB's and SSA's findings properly fall under the definition of Significant Weakness because the Agency determined that the 34 issues identified in Strata-G's Skill Mapping spreadsheet "appreciably increase[d] the risk of unsuccessful contract performance," ECF No. 50 at 22 (quoting AR 2694), which meets the Significant Weakness definition, versus "appreciably increase[d] the risk of unsuccessful contract performance *to an unacceptable level*," *id.* (emphasis in original) (quoting AR 630), which qualifies as a Deficiency. According to the Government, the Agency had broad discretion to determine the level of risk presented by Strata-G's proposal, and SDI's arguments boil down to a mere disagreement with the exercise of the Agency's judgment.  ECF No. 50 at 23; *see* Oral Arg. Tr. at 108:5–9, ECF No. 55. The Court does not disagree that the Agency has considerable discretion to assess performance risk and to weigh the strengths and weaknesses of proposals.  *See Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) ("Contracting officers 'are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." (quoting *Impresa*, 238 F.3d at 1332)).  It must nonetheless evaluate proposals and assign adjectival ratings in accordance with the Solicitation's terms.  *See Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 386 (2003) ("It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation."); *IAP World Servs., Inc. v. United States*, 152 Fed. Cl. 384, 397 (2021) ("'[W]hen [an agency's] determinations are contradicted by the record[,] no amount of deference can save them from being overturned as arbitrary and an abuse of discretion.'" (quoting *DZSP 21, LLC v. United States*, 139 Fed. Cl. 110, 118 n.9 (2018))).

The Government's argument ignores that the definition of Deficiency has two parts separated by a disjunctive "or" and that the qualifying language regarding risk refers only to the latter part.  Specifically, the first phrase of the definition addresses "[a] material failure of a

proposal to meet a Government requirement," and does not take into whether or how the failure increases performance risk.  AR 630.  The second phrase, on which the Government focuses, applies where "a combination of significant weaknesses"[5] unacceptably increases the risk of unsuccessful performance.  AR 630.  Contrary to the Government's argument, basic principles of interpretation counsel against reading the definition of Deficiency as requiring "a finding that a failure to meet a contract requirement 'increases the risk of unsuccessful contract performance to an unacceptable level.'"  ECF No. 50 at 22 (emphasis omitted) (quoting AR 630); *see Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 794–95 (2009) (quoting *Finisar Corp. v. DirectV Grp., Inc.*, 523 F.3d 1323, 1336 (Fed. Cir. 2008) (explaining the doctrine of the last antecedent).  If the Agency finds that an offeror has materially failed to meet a Government requirement, which includes an "omission of data required to assess compliance with the requirement," its exercise of judgment ends there, as the Solicitation's terms instruct it to assign a Deficiency.[6]  AR 630.

As discussed above, the Agency determined that Strata-G did not meet the minimum education requirement stated in the Solicitation both because it did not properly propose employees

---

[5] A Significant Weakness was, in turn, defined as "[a] flaw that appreciably increases the risk of unsuccessful contract performance."  AR 630.

[6] This distinguishes SDI's challenge to the Agency's Subfactor 2 evaluation from its challenge to ratings assigned under other Technical subfactors.  Juxtaposing the Agency's findings with respect to Strata-G's Skill Mapping spreadsheet to its findings with respect to SDI's Hazardous Material Management Program ("HMMP") plan (under Subfactor 1), the Government emphasizes that the Agency has the discretion and expertise to determine whether a lack of information "prevents [it] from assessing a requirement or whether it is a weakness in the offeror's attempt to fully meet the requirement."  ECF No. 53 at 9.  That is true enough; however, the crux of SDI's Subfactor 2 argument does not question the Agency's findings but rather whether it correctly assigned adjectival ratings based on those findings.  Unlike Strata-G's labor skill mix, the Agency did not find that SDI's HMMP proposal failed to meet a Government requirement or that omissions prevented the Agency from assessing whether it met a requirement.  *See* AR 3268 (finding SDI did not fully address the HMMP requirements, "elevat[ing] the risk of unsuccessful contract execution" and warranting a Significant Weakness); AR 2596 (TET consensus evaluation finding SDI's HMMP proposal "met Base CDRL A025 HMMP requirements").

with the correct educational degrees and because it proposed a substitute for the proper degree of each personnel. *See, e.g.*, AR 3160. Significantly, the Agency concluded that these issues prevented it from evaluating the personnel capabilities proposed, as was required by the Solicitation. *See, e.g.*, AR 3160, 3172; *see* AR 603, 623. Accordingly, the Agency acted arbitrarily and capriciously by failing to assign a Deficiency to Strata-G.

      2.    <u>The Agency's Failure to Assign a Deficiency to Strata-G Prejudiced SDI.</u>

SDI argues that but for the Agency's error of failing to assign Strata-G a Deficiency for Technical Subfactor 2, SDI would have been the only acceptable proposal; thus, the Agency's act prejudiced SDI. ECF No. 47 at 40. The Court agrees. Per the RFP, receiving one or more Deficiencies results in an Unacceptable rating, meaning the "[p]roposal is unawardable."[7] AR 628; *see* ECF No. 55 at 54:14–25. Therefore, had the Agency properly assigned a Deficiency to Strata-G for Subfactor 2, Strata-G would have been ineligible for award and SDI would have been the only remaining offeror. *See Alfa Laval*, 175 F.3d at 1367 (noting that a protestor establishes prejudice by showing "that there was a substantial chance it would have received the contract award but for that error" (quoting *Statistica*, 102 F.3d at 1582)). Accordingly, SDI has established the prejudice element of its bid protest claim.

**B.    SDI is Entitled to a Permanent Injunction.**

Having determined the merits of SDI's protest, the Court turns to whether SDI is entitled to permanent injunctive relief. SDI contends that a permanent injunction setting aside the award

---

[7] For example, in evaluating [. . .]'s proposal, the SSEB referred to the RFP and noted that "Unacceptable Technical ratings are obtained when the Technical Evaluation Team identifies one or more Deficiencies as per the definitions in the Combined Technical/Risk Ratings Figure for 'Unacceptable' (*i.e.*, 'Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable. Proposal is Unawardable.'). [. . .] had multiple Deficiencies; therefore, [. . .] is not awardable from a Technical perspective." AR 3083.

to Strata-G and requiring the Agency to conduct a proper evaluation is warranted.  ECF No. 47 at

42.  The Government and Strata-G respond that SDI is not entitled to an injunction because SDI

has not proven irreparable harm and the injunctive relief factors weigh in favor of the Government.

ECF No. 50 at 40; ECF No. 49 at 44–45.  According to the Government, instead of presenting

specific evidence of harm, SDI only generally states a loss of opportunity and offers no argument

why a less drastic remedy like a stay and remand would not be sufficient.  ECF No. 50 at 41–42.

To obtain a permanent injunction, a protestor must show that: (1) it has succeeded on the

merits, (2) it will suffer irreparable harm if such relief is not granted, (3) the balance of hardships

tips in the protestor's favor, and (4) an injunction will serve the public interest.  *Loomacres, Inc.*

*v. United States*, 136 Fed. Cl. 331, 342–43 (2018) (citing *Centech Grp., Inc. v. United States*, 554

F.3d 1029, 1037 (Fed. Cir. 2009)).  Under this standard, "[n]o one factor, taken individually, is

necessarily dispositive[;] . . . the weakness of the showing regarding one factor may be overborne

by the strength of the others."  *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).  At

the very least, however, a protestor must actually succeed on the merits and demonstrate

irreparable harm.  *See CliniComp Int'l, Inc. v. United States*, 134 Fed. Cl. 736, 746 (2017), *aff'd*,

904 F.3d 1353 (Fed. Cir. 2018) (citing *Altana Pharma AG v. Teva Pharm. USA, Inc.*, 566 F.3d

999, 1005 (Fed. Cir. 2009)); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350

(Fed. Cir. 2001) (holding that a party must show at least a likelihood of success and irreparable

harm to receive preliminary injunctive relief).  To assess irreparable harm, the "relevant inquiry .

. . is whether plaintiff has an adequate remedy in the absence of an injunction."  *Magellan Corp.*

*v. United States*, 27 Fed. Cl. 446, 447 (1993).

SDI has already demonstrated that the first factor weighs in favor of permanent injunctive

relief because it has succeeded on the merits of its claim that Strata-G should have received an

Unacceptable rating for the Technical factor and been considered ineligible for award.  *See Excelsior Ambulance Serv., Inc. v. United States*, 124 Fed. Cl. 581, 594 (2015) (holding protestor demonstrated actual success factor in protest challenging award to offeror with technically unacceptable proposal).

The second factor—irreparable harm—likewise favors injunctive relief because without an injunction SDI will lose the chance to fairly compete for a lucrative government contract; indeed, it would have been the only eligible offeror had the Agency properly evaluated proposals.  *Id.* ("[T]he 'denial of a fair opportunity to compete and loss of financial benefit from a lawful procurement process constitute[s] irreparable harm.'" (quoting *BCPeabody Constr. Serv., Inc. v. United States*, 112 Fed. Cl. 502, 514 (2013))).  Courts have "repeatedly held that the loss of potential profits from a government contract constitutes irreparable harm." *WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 288 (2021) (quoting *BINL, Inc. v. United States*, 106 Fed. Cl. 26, 49 (2012)); *see McAfee, Inc. v. United States*, 111 Fed. Cl. 696, 713 n.16 (2013) ("Because a bid protest plaintiff cannot recover lost profits, this court has held that such losses constitute irreparable harm in the context of a bid protest."); *see also CW Gov't Travel, Inc. v. United States*, 154 Fed. Cl. 721, 750–51 (2021) (collecting cases); *Remington Arms Co., LLC v. United States*, 126 Fed. Cl. 218, 232 (2016); *Contracting, Consulting, Eng'g LLC v. United States*, 104 Fed. Cl. 334, 355 (2012); *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 552–53 (2011); *Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005)  Although some judges have held that economic injury alone does not rise to the level of irreparable harm unless extraordinary financial circumstances exist, *see, e.g.*, *OAO Corp. v. United States*, 49 Fed. Cl. 478, 480 (2001), the majority hold that lost profits stemming from a lost opportunity to compete for a government

contract is sufficient.[8]

The balance of hardships likewise tips in favor of enjoining the award.  On the one hand, SDI faces the prospect of losing out on fairly competing for, as well as potentially receiving the profits expected from, the contract.  On the other hand, Strata-G faces minimal harm, as the Court has already determined that it should not have been awarded the contract.  As for the Government, it argues that an injunction would delay the procurement process, which would increase risk to the Department of Defense's and other government agencies' warfighting capabilities and may result in the Agency losing approximately $1.75 million in expiring funds.  ECF No. 50 at 42 (citing Decl. of Gregory A. Wilson, ECF No. 50-1).

As another judge of this Court has observed, "delay in implementing the [challenged] contract or in arranging for an alternative means to acquire the goods or services at issue while complying with the terms of the injunction, absent exceptional circumstances, does not 'warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests.'" *Mgmt. & Training Corp. v. United States*, 161 Fed. Cl. 578, 618 (2022) (citations omitted).  The circumstances presented here raise issues of national security.  Although the Court should not "blindly accede" to assertions of national security, it gives them, as it must, the serious consideration they are due.  *Crowley Tech. Mgmt., Inc. v. United States*, 123 Fed. Cl. 253, 266 (2015) (quoting *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 655 (2003)); *see* 28 U.S.C. §

---

[8] The Government suggests the majority view is no longer good law on this point in light of the Federal Circuit's decision in *System Studies & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021), which held that there is no presumption of prejudice to a protestor upon a showing that the procuring agency acted irrationally.  ECF No. 50 at 40.  The prejudice standard, which constitutes an element of a bid protest claim, is separate and distinct from the irreparable harm factor of the permanent injunction standard.  The former goes to establishing the merits of the claim, while the latter is weighed in determining the appropriate relief provided to a successful claimant.

1491(b)(3).  The Agency provides a broad explanation of the risks that would likely be caused by a delay in modernizing SUAS technologies through the work contemplated by the challenged contract.  *See* ECF No. 50-1 ¶¶ 5–6, 9–10.  Unfortunately, it is difficult to discern from the Agency's declaration the concrete effect an injunction would have on our nation's warfighting capability.  The Agency represents that the details cannot be disclosed at this security level, and it has not sought to submit to the Court at an appropriate level a more detailed explanation of the harms.

The Court notes, however, that given the basis of its decision an order enjoining the award to Strata-G does not necessarily require re-solicitation or a wholesale re-evaluation, with the accompanying delay.  Regardless, the length of and any attendant delays in this procurement lay largely at the Agency's doorstep and tend to undermine at least the immediacy of its national security concerns.  The Agency approved the Acquisition Plan for this procurement in October 2021, issued the official RFP in June 2022, and awarded the contract in late February 2023—a timeline of approximately one and one-half years.  AR 16, 586, 3290.  Moreover, although SDI promptly filed its protest, the Agency's request for a voluntary remand—after the parties began briefing dispositive motions—delayed this litigation by at least two months.  The lost time seems especially unproductive given the Agency's evaluations on remand were mostly unchanged with respect to Strata-G's Skill Mapping spreadsheet.

From the Court's perspective, the upcoming close of the fiscal year and the Agency's desire to obligate and expend the almost $2 million of FY23 funds associated with the challenged contract has been the main driver of the time-sensitives in this case.  *See* ECF No. 50-1 ¶ 7; ECF No. 55 at 62:15–18.  But the strictures of the appropriations process are far from unique to this procurement, and the proximity of this Court's decision to the fiscal-year end is a circumstance of the Agency's

own making.  *See Sheridan Corp. v. United States*, 94 Fed. Cl. 663, 670 (2010).  Moreover, there is one remaining eligible offeror (SDI), closely matched in ratings to Strata-G and with a reasonable and realistic price (AR 3265, 3286), to which the Agency could conceivably award the contract by September 30.  As such, the balance of hardships tips in favor of SDI.

Finally, the public interest also favors enjoining the award to Strata-G.  The record reflects that the Agency's evaluation of Strata-G's Skill Mapping spreadsheet, and ultimate decision to award it the contract, was not in accordance with the terms of the RFP.  As other judges of this Court have recognized, "[t]here is an overriding public interest in preserving the integrity of the procurement process," *Hosp. Klean of Tex.*, 65 Fed. Cl. at 624, to ensure that "'honest, open, and fair competition'" is not compromised, *CW Gov't Travel*, 154 Fed. Cl. at 751 (quoting *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003)).  And especially where, as here, the procurement concerns the design and engineering support of military technologies, the public has a strong interest in being assured that the Agency has awarded the contract to an offeror whose personnel meet the minimum requirements specified in the Solicitation to be qualified to perform the work.

Accordingly, each of the factors favors enjoining the award to Strata-G.  SDI is entitled to the injunctive relief that accompanies its success on the merits.

## IV. CONCLUSION

For the reasons set forth above, SDI's Motion for Judgment on the Administrative Record (ECF No. 47) is **GRANTED**, the Government's Cross-Motion (ECF No. 50) is **DENIED**, Strata-G's Cross-Motion (ECF No. 49) is **DENIED**, and SDI's initial Motion for Judgment on the Administrative Record (ECF No. 35) is **DENIED AS MOOT**.  The Agency is hereby enjoined from proceeding with the contract unlawfully awarded to Strata-G.  The Clerk is directed to enter judgment accordingly.

This opinion and order will be unsealed in its entirety after October 5, 2023, unless the parties submit **by no later than October 2, 2023**, an objection specifically identifying the protected information subject to redaction.  Any objecting party must submit a proposed redacted version of the decision and provide the reason(s) supporting the party's request for redaction.

**SO ORDERED.**

Dated: September 21, 2023                                      _/s/ Kathryn C. Davis_____
                                                              KATHRYN C. DAVIS
                                                              Judge